We're here on a certified question. Thank you for agreeing to take the case up. I do believe you have to speak. We are recording. So the more you speak up, the better it's going to be. Plus, we need you to speak up. That's one of the first times in my life. I'm going to go home and tell my wife that this morning a judge told me to speak up. She won't believe you. We're here on a certified question. Thank you for taking the case up. I think both Mr. Korn and I agree that how you're going to rule on this is going to basically get rid of the case as a practical matter. As you know, Your Honors, in retaliatory discharge cases, there's a possibility for three different types of damages. You can get your lost wages, you can get some emotional distress damages, and then in some cases you get punitive damages. But because the defendant in this case is a governmental entity, punitive damages are off the table. What Judge Gross did in Mr. Korn's partial motion for summary judgment was to rule that the possibility of getting lost wages in this case was foreclosed. And so if we tried a case, we're only going to get emotional distress damages. And frankly, the case isn't really worth that. Just to kind of hone in on Judge Gross's ruling, I mean, the specifics of what he determined was that the lost wages were not proximately caused by the discharge. Well, he did that as well as I think the primary basis of his ruling is that the Workers' As to the proximate cause, Your Honor, the facts are that basically we've alleged in our complaint, and we would like the jury to hear this evidence, that the employee orders insurer, the claims adjuster, made the decision to deny coverage for operation. The surgeon, Dr. Freehill, that was sent to, my client was sent to Dr. Freehill by the insurer, basically recommended surgery. And if the case were to be tried, there's going to be an issue about what that decision was about. Well, my client's going to testify that he handed the client surgery. They didn't have the means to pay for it. And so the case was, coverage was denied, interestingly, because of a claim that there was no accident when there was actually a witness to the accident that was, I don't know if this is in the record or not, so I better not get into that. It is. Well, there was a witness to the accident and the claims adjuster never talked to that person and was still denying coverage. Well, as a result, as things went on and went on and went on, in the following May, after my client had been terminated, he goes back to Dr. Freehill. She refers him to a specialist in St. Louis and says, look, it's too late. You are, Mr. Gale, you're no longer a candidate for surgery. Now, Dr. Freehill testifies in her deposition that she gets about an 80 or 90 percent positive recovery rate on these types of surgeries that he would have been a candidate for the prior fall. And so it was her testimony, within a reasonable degree of medical certainty, if he had had his surgery properly, he could have had his shoulder repaired, could have gone back to work. Okay, now let me ask a question about his ability to go to work anywhere. He can do sedentary work, Your Honor. In fact, he had secondary employment with West City down here in Benton, but it was essentially a desk job. But in so far as doing, as driving the truck, doing any kind of significant lifting, he cannot do that job that he was doing at the time of his alleged injury no longer. He's not a candidate for doing that work. So he can't go back to his original job, but he could do some kind of work. Sedentary work. And it's not a dispute between the parties at this point that, and I think if we were to try the case, I don't think we could pursue a theory that, well, they had an obligation under these circumstances to offer him sedentary work. But there's no dispute, is there, that the reason he is unable to work, whatever his limitations are, are as a result of the ultimate outcome of his work-related injury? Well, when you say ultimate outcome, that would be correct. Yeah. And that's, in other words, it's his physical condition that prevents him from working. That is correct, Your Honor. And I don't think there's any dispute that the physical condition originated on him. He was, at the time, before the accident, the moment before the accident, he was working without restrictions after the accident back in the summer of 2009, I believe it was. He basically never did go back to work. So it is linked to the accident itself. Of course, it's our position that the ultimate responsibility for this, given what Dr. Freo was saying, is their decision to deny the treatment. And so we believe that, and that's why we're bringing this, that that should fall within the scope of the retaliatory discharge. Whatever, as far as his ultimate physical condition, wasn't all that recoverable under the Workers' Compensation Act? No, it was not, Your Honor. Okay, what part of it was not? Well, I mean, now I know he's settled, okay, but, I mean, doesn't the Workers' Compensation Act provide for remedies for what his ultimate physical condition was? It does provide for remedies, so what you've asked is kind of a second question. Right. But as we try and stress in our brief, there is the TTD. You know, I know that you guys, you especially, because I see you up in Springfield all the time, you're very, very familiar with the TTD remedy, but there's a limitation on that because it's not only going to be two-thirds of what your average weekly wage is, and there's also, built into your permanent partial disability award, there's obviously some kind of factor in there for the, for the claimants, for the employee's inability to perform work in the future, but that's highly, it's very difficult to determine how much of that award would be attributable to future employment, and that's capped, in most cases, at 60% of the recovery. And so what, what, what we contend, Your Honor, is that, Your Honors, that when Feigl, the claims adjuster, decided to stonewall this, stonewall this treatment, not interview the witness, that that was essentially an intentional act to deny coverage. And then as we also point out in our recovery, there was correspondence between the actual employer and Feigl saying, we want you to pay special attention to this claim, which is exactly what Feigl did. So the process was put into motion whereby they have an absenteeism policy, that's agreed, they have an absenteeism policy there, but what happens as a result of their refusal to pay for the coverage, and my client's inability to pay for the, for the operation, he goes right by the absenteeism limitation provision, and he can't go back to work. And under Sekirka, certainly that evidence is admissible on the issue of liability. Certainly, Your Honor, and that's of course, and Mr. Corey and I kind of disagree about the importance of that case, but I think Sekirka is very important because it does take the position that the decisions of the claims adjuster should be, must be imputed to what the, to the employer in a retaliatory discharge case. Now, let me ask this question. In just, in any wrongful discharge case, employment case, in order to recover lost wages, don't you have to prove an ability to work? Let me give you an example. Let's say you have a contract for employment, and that contract is breached and you're fired, and a week later you get run over by a truck, and you're permanently totally disabled and you can't work. Can you still recover future lost wages from the discharge if you're not able to go to work anyway? Certainly you get the one week before you get run over by the truck. Well, I'll concede that. Look, if the defendant was in some way responsible, we can connect the run, being run over by the truck to the defendant, and as a result of the tortious act of the defendant causing the plaintiff not to be able to work, then we should be able to say, defendant, you are a tortfeasor insofar as the second action is concerned, and the plaintiff should be able to get their lost wages. And it's axiomatic. I'm sure you get these cases all the time where somebody says you're in a car crash, you can no longer work, and the defendant is liable for the lost wages. And that's what we have in this case. Yeah, certainly if it was the injury, the accident that caused the inability to work. Let me ask you another question. The defendant cites the Critson case? Yes. Okay. In Critson, it appears that the court there more or less treated TTD, PTD, or PPD as a set-off type situation. They said you can't recover lost wages during the period of time you were drawing TTD, because that was covered by the Workers' Compensation Act. So why shouldn't this situation be treated as a set-off? He settled the case, both parties agreed, this is how much TTD you get, this is how much permanent partial, this number of weeks. If he's able to work sedentary labor, then why shouldn't you recover future lost wages with that being a set-off? Your Honor, I was afraid you were going to ask that question. And so I'm going to be forced, but it is something that I was so, not in so much fear of the question that I hadn't thought about. First, the Critson case. As I read that case, what the plaintiff was trying to do was get lost wages recovered in the retaliatory discharge case before the termination. And I think the Critson case, in court in that case, appropriately said, you may not even recover anything before the termination. In our case, and we agreed in the Judge Gross's court, that any lost wages is going to have to post-date the termination. So that's a distinguishing factor. But I don't think there's any dispute that when you look at the settlement contract here, that Mr. Korn's going to be able to prove that some of that money that was built into the workers' compensation settlement was post-termination T.T.D. And although I agree with what the plaintiff is saying... Let me ask a question about that if I could, because it isn't very clear in the record. But my understanding was that prior to the settlement, the employer paid T.T.D. for some period of time, a pretty substantial period of time, and that was already paid. I think that's true, Your Honor. And then in addition to that T.T.D. for X number of weeks, that's probably provable at least by letters or whatever. In addition, they paid this $50,000 at the time of settlement with $20,000 earmarked for medical and the balance for permanent partial disability. Is that right? Your Honor, yes. If you look at page A419 of the record, the back page of the settlement agreement, I think it's in the record, and you can flesh out those numbers, but I think that is correct. Okay, so if that's the case, how is any part of what's in the settlement contract T.T.D.? If it was paid separately and earlier, and then the settlement contract itself designates it as medical and permanent partial disability? I'm looking at it right now, and it doesn't appear, although my eyes are, you know... The font here is so... Mr. Cornyn can read it, but I can't. But I think that's right. Okay. And I would agree reluctantly that they would be entitled... They've got the numbers. They're going to be able to prove that. I would agree somewhat reluctantly that they would be entitled to a set-off for the amount of T.T.D. that was paid. But here's the concern I've got, and this is why I'm concerned about the question. Certainly part of the permanent partial disability... Some of that has got some kind of future wage loss of income component into it. That's kind of what the gravamen of the workers' compensation statutes are about. Are we going to give them a set-off for all or any portion of that amount? And I would take the position that it's their burden to establish what portion of the T.T.D. would be allowed in a set-off. If they're going to search a set-off, they've got the burden of proof, and I don't think they would ever be able to show that in terms of our lost wages recovery, a set-off for the permanent partial disability portion of it. Well, there's a fact issue. Yes. Would be the point. And as it stands right now, the trial court has said you can never recover lost wages, period. But what I hear you telling me today is he can do sedentary work. Correct. It's not like he can never work anywhere ever again. And ordinarily in this kind of a case, wrongful discharge case, let's say he was making $20 an hour, now he's making $5 an hour. Correct. You know, that's the way you would do it. So you would say, why shouldn't a jury determine what portion of that is as a result of the discharge as opposed to his physical condition? The actual facts of the case, Your Honor, is that at the time he was injured, he was working both jobs. And so I do not believe that there should be any reduction for the job that he continues to work throughout. He was working both jobs. Firefighter. Right. Okay. And so what my point is, Your Honor, is that that was a tortious act that was decided by the claims adjuster before the absenteeism days with limitations ran out. Now, Mr. Korn makes a kind of an interesting argument here. He says that it was the termination. I had to connect the lost wages to the act of termination. And the termination didn't have anything to do with what the claims adjuster did. And that's what Critson says. Critson says, you know, that wages lost as a result of the physical condition are not connected to the termination. Your Honor, you know, when you see a case side by the other side, there's always that temptation to try and do whatever you can to say, well, that's just a bogus construction and make it your case. But in this case, I actually believe the Critson case helps us. Because Critson makes it very clear that the employee in a retaliatory discharge case should be able to get all damages causally connected to the tortious act. Now, I hold the view, I would like to convince the jury that the tortious act occurred back in October when the decision was made to stonewall the treatment. Because given Dr. Friedo's testimony, I'm going to be able to convince the jury, given the chance, that she's the one, it was her tortious act. For example, and I'm sure the court runs into these cases all the time, there's a pothole in the road and the defendant has got responsibility for fixing the pothole. And somebody from the defendant drives by, sees this huge pothole there, doesn't put up a sign, doesn't do anything to alert a motorist about it. And then it's there, and it's there, and it's there. They're on notice. Two weeks later, the plaintiff comes along, drives into the pothole, seriously injured. Now, the tortious act didn't occur at the moment that the plaintiff was injured. Now, of course, the plaintiff didn't have a cause of action until the plaintiff had injury. But the tortious act occurred when they didn't fix the pothole two weeks before. And when you read Princeton, it says, all damages approximately flowing from the tortious act. The tortious act, in this case, was the prior fall. And that's, and it naturally flows. And I think the jury could award us a recovery if it hears this evidence. One last point I see the yellow light is on. And that is, on the exclusive remedy argument. The red light is on. You'll have some rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Judge Gross had two bases for his ruling on defendant's motion for partial summary judgment. One was that the lost wage claim was barred in the unique circumstances of this case, was barred by the exclusivity provisions of the Workers' Compensation Act. And two, as you pointed out earlier, that the approximate cause element is lacking. And quite frankly, given the facts of this case, both levels of his ruling are correct. First, the Workers' Compensation Act allows employees to obtain compensation if they show they suffered an injury arising out of and in the course of their employment. The case law is very clear that the statute is remedial in nature. It's to be construed broadly. That's why you see language such as the injury need not be the sole causative factor as long as it was a causative factor in the resulting condition of ill-being. You also see language which talks about every natural consequence that flows from an injury is compensable under the Workers' Compensation Act. Here, there's no question that Mr. Dales, the plaintiff's lost wages, naturally flow from his injury on the job. There's no question that Mr. Dales' lost wages, a cause, maybe not the sole cause, but a cause of his lost wages is the fact that he was injured on the job. And that's why the cause of action, in a general sense, why these damages are barred by the exclusivity provisions of the Workers' Compensation Act. So you look at the broad remedial nature of the Workers' Compensation Scheme, and I think you come to the conclusion that, of course, the lost wages in this circumstance flow from his injury. They're covered by Workers' Comp. But then you look at the language in the specific compensation scheme set forth by the Workers' Compensation Act. The scheme provides for temporary total disability benefits, permanent total disability benefits, and a wage differential. In other words, if an employee, like the employee in our case, is injured on the job, and they are unable temporarily to return to work, they're entitled to TTP. If they are permanently unable to return to work, they are entitled to permanent total disability under the Workers' Compensation Act. If they are able to return to work, but just not able to return to work in their prior position, they're entitled to the compensation scheme or the wage differential benefit. And, yes, TTD is calculated at two-thirds of the wage rate, and, yes, the Kurtz and Clay case talks about a set-off because of that two-third differential. But the fact of the matter is that when the Workers' Compensation Act was enacted by the Illinois legislature and this type of discussion was all over the case law, it was a compromise. It's a compromise between a no-fault system of liability for an employer and a quick or expedited and defined set of compensation for the employee. So Mr. Dale, the plaintiff in this case, if he was rendered permanently unable to return to work in any capacity, or if he was rendered unable to return to work as a bus driver for South Central Illinois Mass Transit District and then was stuck doing a sedentary job, the compensation scheme of the Workers' Compensation Act was at his fingertips. It was available to him. He could have obtained compensation for a permanent total disability. He could have obtained a wage differential compensation. Well, and the complaint here on the plaintiff's side is that the insurance adjuster delayed treatment, but the Workers' Compensation Act provides remedies for that as well. Yes. Could have filed a 19B petition, could have asked for penalties, et cetera. That was going to be my next point, and that's the Illinois Supreme Court in Robertson v. Travelers Insurance Company. And then there's also another court case, and I believe they're both cited in our brief. I know the Robertson case. The other one is Echo Barger v. Dixon Publishing, 221 LF 3457. But both of those cases involve employees who go through the workers' compensation process, that after the process concludes, brings a separate cause of action claiming the workers' compensation carrier delayed somehow in processing and handling my claim, and as a result of that delay, I have been damaged. In both cases, the employees that were suing claimed financial damages like lost wages, although it's not specified, but it was financial damages and it was emotional distress damages. And the court said this type of claim, whether it's brought against the workers' compensation carrier or the employer, is barred by the exclusivity provisions. And it said, this is a quote from the Illinois Supreme Court, the overriding purpose of the Workers' Compensation Act, especially as expressed through its penalty provisions, is to compensate claimants as early and as thoroughly as possible for income loss due to job-related injuries. And as much as Plante was allowed to present his compensation claim to the Industrial Commission, he had an opportunity to seek whatever statutory penalties were available to him and cannot seek his remedy for delay in an action at common law. To permit such a course would invite the indefinite prolonging of litigation, risk double recoveries, and inconsistent findings of fact, a result of which the legislature, in enacting a system of compensation in place of common law remedies, wished to avoid. That was exactly the thrust of our argument before Judge Gross in Perry County, to allow the hypothetical employee in Article 308 in the issue certified for appeal, Mr. Dale. But to allow a hypothetical employee who was rendered physically and medically unable to return to work because of a workers' compensation carrier's delay in approving medical treatment. To recover lost wages in a subsequently filed discharge case when the workers' compensation scheme provides a mechanism to recover lost wages, occasionally by delay, would basically render exclusivity meaningless. It wouldn't be exclusive. It would only be exclusive to the extent that a plaintiff's lawyer, after the fact, decides not to pursue additional remedies because of delay. Well, this is not a case, though, where he's permanently, totally disabled from all work. That's correct. You know, I mean, these lost wages in a wrongful discharge case generally go out into the future. And, I mean, he does have an ability to go work at some point. So why wouldn't there be an issue of fact of how much of a set-off there should be for the portion of his lost wages attributable to his physical condition, as opposed to the discharge? I mean, that's essentially what the case you rely on says, Critson. I mean, they say whatever is attributable to his physical condition resulting from the work-related injury, he can't recover. Right. All right. But where we're at right now in this case is he can never recover for any lost wages at all. Couldn't there be a factual scenario where some of those are attributable to the discharge? I don't think so. I think that the reason why he's not, why he can't work as a bus driver, I mean, that's what he did for South Central Illinois Mass Transit District. The reason why he can't work as a bus driver is because he sustained an on-the-job injury. So his lost wages directly flow from the injury that he sustained. And let me just, this isn't what happened here, but this is a hypothetical that amplifies the point that we make on this causation issue, which is the last issue. Mr. Dale was unable to work after he sustained his injuries. If South Central Illinois Mass Transit District, even recognizing that he was unable to work, never terminated his employment, just said, when you can come back to work, Mr. Dale, come back to work. We're not going to terminate your employment. You come back whenever you want. He would still be sustaining these lost wage damages. The termination decision didn't in any way cause these damages. It doesn't matter if he was terminated or not. He's not, he can't earn his wages because he's not ready, willing, and able to work. And Mr. Dale can, I mean, Mr. Dunham can talk all he want about tortious conduct and damages that stem or flow from the tortious conduct, and the tortious conduct being the conduct of the worker's compensation claims adjuster. But in a wrongful discharge case, when you're looking at what damages are recoverable, it's very clear. The Illinois Supreme Court says it's very clear, and the tort to date, our Supreme Court has not expanded the tort of retaliatory discharge to encompass any behavior other than actual termination of employment. I mean, this court has held that, the Welsh case has held that. That is the law. There's no such thing as retaliatory demotion or retaliatory conduct by a worker's compensation claims adjuster. It's the tort of, it's called retaliatory discharge for a reason. And the damages have to flow from the discharge, not flow from some behavior that preceded the discharge by six months. So, you know, I think that's about it. I guess I have a few more minutes, but I really don't know that I need to use them. I'll just say a few things about the record. There was some dispute in the record in the underlying worker's compensation proceeding as to how this accident happened. It wasn't just the accident that happened in a worker's compensation carrier, just willy-nilly delayed treatment. In the emergency room record, on the date of the accident, it describes an accident that is completely different than what Mr. Dale was claiming when he applied for worker's compensation benefits. In his work count claim, he claims he was helping put a wheelchair passenger on a bus. In the emergency room record, six hours after the accident, it says, fall in a level parking lot. Mr. Dale doesn't know why that was there, doesn't know why it says that, but it does say it. And the worker's compensation claims adjuster, who we deposed, said, yeah, we didn't know how this accident happened. We didn't know if this guy was making it up or not. So they delayed in approving treatment so that they could investigate it further. Now, ultimately, they ended up approving the treatment and the worker's compensation case settled. But it wasn't like they just completely, Mr. Dunn used the term, stonewalled, purposeful delay. It wasn't that at all. It was months. It was months. Correct. It was months when they were supposedly trying to decide whether to approve the claim over this one emergency room record. Correct. And had been told long before there was one witness and never interviewed the witness. So, I mean. Right. Sounds like stonewalled to me. Well, I mean, you know. I mean, as far as that part goes. It certainly could be construed as, I mean, you used the term stonewalled, of course. You know, I like that term. If it was a delay, and if it's an unreasonable delay, that's what Section 19 is for, the worker's compensation. That's a different point. That's a different point. Right. Is there a remedy under the worker's compensation? Right. And there absolutely is a remedy in that type of situation. So, unless you have any other questions. No questions. Thank you, Your Honor. Thank you, Your Honors. If the lost wages naturally flows from the original accident, then if you think about it, every retaliatory discharge claim found in the State of Illinois, you could not recover lost wages. Because they all relate back to the original injury. Well, it depends on whether or not the person's physical condition keeps them from working. I mean, there are a lot of worker's compensation claims, and then people get fired, but they recover. They're able to go back to work. My point is, Your Honor, let's assume that case. Let's assume it was a Sikirka case, and my client got his surgery and was able to return back to work. Mr. Corr's argument naturally means that he doesn't get even the lost wages in Sikirka because it all relates back to the original accident and why he was off work. But the accident on the job, there's no retaliatory discharge claim. It has to start with the accident.  Your Honor, I know that you must be familiar with cases where, okay, the claimant filed a 19B petition. The respondent gets an IME doctor in St. Louis and says that it's not related, or it's just a sprain. And so you win in front of the arbitrator. They take an appeal to the commission. They take an appeal to the circuit court. They take an appeal to the appellate court, and it's four years later. And that's perfectly true. However, the Workers' Compensation Act does provide a remedy that allows you to go through those processes. Four years later, and the simple fact of the matter is, and I don't think we should ignore realities, what happens is that the respondent, as long as they've got that IME physician report, they save themselves from the penalties argument, and these cases wind up getting settled for less than what they're worth because the respondent can take it out for four years if they choose to do so. And that's essentially what we have here. The statute, the exclusive provision, the Illinois courts have basically said there are some exceptions. They're only for accidental injuries. This is an intentional tort. Intentional torts are outside of it, and retaliatory discharge cases are outside of it. Now, in Kelsey, when the Illinois Supreme Court promulgated this remedy, the cases very quickly fell into place and said, okay, what kind of damages can you get? Appropriate case, you can get punitive damages, you can get emotional distress damages, and you can get lost wages. That's the scope of the tort. And if this is, if superca is good law, and I think it is good law, it must be followed, then you cannot limit the plaintiff's ability to get lost wages for the tortious conduct of the employer. Now, I agree they should be able to get a set-off for the money that they've already paid in the worker's compensation claim, but to just totally foreclose and say, in these types of cases, that you don't get any lost wages at all, certainly in the superca case that the implication isn't there, I do really think we're on the slippery slope. If you answer these questions in favor of the respondent, I think the next set of cases you're going to get in your traditional retaliatory discharge case, you're going to be getting cases that say the plaintiff's not able to recover for lost wages because I think you're there, I don't think there's any distinctions that can be made, and if they are, if they can be made, they're going to be very, very difficult to implement. Thank you, counsel. Case will be taken under advisement.